Jones, Chief Judge,
delivered the opinion of the court:
This is a congressional reference case. It involves reimbursement and compensation for services performed by the plaintiff between 1950 and 1953 in cooperation with the Beconstruction Finance Corporation and other Government agencies in connection with a project to establish an 8,000-acre abacá plantation in Ecuador for the Government pursuant to the Abacá Production Act, 64 Stat. 435, 50 U.S.C. §541.
The plaintiff’s petition was filed pursuant to S. Bes. 102, adopted May 19,1955, which reads as follows:
Resolved, That the bill (S. 427) entitled “A bill for the relief of the Geo. D. Emery Company”, now pending in the Senate, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same, in accordance with the provisions of said sections, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.
The evidence for this case was taken before Mastín G. White, one of our trial commissioners, who heard the witnesses and examined the documents in the case.
A brief summary of the facts, as well as the conclusions we have reached are set forth at the end of this document under the heading “Becommendation”.
*73 We have adopted bis findings, which are as follows:
1. On January 14,1955, there was introduced in the Senate of the United States a bill designated as S. 427, 84th Congress, “A bill for the relief of the Geo. D. Emery Company.’' It was provided in the bill that the Secretary of the Treasury should pay to the Geo. D. Emery Company the sum of $250,000 “* * * in full settlement of all claims of the said Geo. D. Emery Company against the United States for reimbursement and compensation due for services performed between 1950 and 1953, in cooperation with the Reconstruction Finance Corporation and other Government agencies in connection with the project to establish for the Government an eight-thousand-acre abaca plantation in Ecua-
2. On May 19, 1955, the Senate of the United States adopted S. Res. 102, 84th Congress, referring S. 427, 84th Congress, to the Court of Claims in accordance with Sections 1492 and 2509 of Title 28, United States Code, and directing the court to “* * * report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.”
3. The Geo. D. Emery Company (which will usually be referred to in these findings as “Emery”) is a corporation organized under the laws of Maine. It maintains its principal office in New York City. Emery was developed from a hardwood manufacturing business in Kentucky, established by Geo. D. Emery in 1869. From 1869 to 1882, it operated as a proprietorship; from 1882 to 1902, it operated as an unincorporated company; and since 1902, it has operated as a corporation. Emery’s operations are confined principally to Ecuador, Brazil, and the Philippines; and the principal products handled by the company are balsa wood and Philippine mahogany, although it also handles Paraná (Brazilian) pine, lignum vitae, Spanish cedar, and other tropical woods for special purposes. In conducting its operations, Emery has carried on activities in and dealt *74 with Latin American countries for approximately 50 years.
4. (a) Abacá, tire commodity mentioned in S. 427, 84th Congress (see finding 1), is a plant similar to the banana plant. It grows only in the tropics. Abacá needs at least 100 inches of rainfall a year, and the moisture must be distributed with reasonable evenness throughout the year. The abacá stalk grows to a height of from 25 to 30 feet, and the diameter of the matured stalk ranges from 12 to 18 inches, or even more where conditions are especially favorable for the growth of the plant. The stalks grow in clumps or mats. A mat may contain as many as 100 stalks. Abacá is propagated by obtaining bits or pieces of the root material from an existing mat and then planting them.
(b) The fiber of the abacá plant has great tensile strength and good resistance to salt water. Its principal use is for marine cordage, but it is also used extensively wherever heavy, strong rope is needed. It is a strategic and critical material, and an adequate supply is vital to the military and industrial requirements of the United States.
(c) The Philippines had been virtually the sole source of the abacá fiber used in the United States prior to World War II. When the Japanese military forces occupied the Philippines during World War II and shut off the supply of abacá fiber from that source, the United States, acting through a subsidiary of the Reconstruction Finance Corporation (which will usually be referred to in these findings as the “RFC”), proceeded to establish abacá plantations in Central America. It happened that, many years prior to World War II, an employee of the U. S. Department of Agriculture had obtained some abacá root material from the Philippines, transported it to Panama, and planted it in the experiment station operated there by the U. S. Department of Agriculture. Then in 1925, the United Fruit Company had obtained some abacá root material from the experiment station in Panama and used it to establish an abacá plantation in Panama. This plantation consisted of approximately 2,000 acres at the outbreak of World War II. When the RFC undertook the establishment of abacá plantations for the United States during World War II, it contracted for the services of the United Fruit Company in *75 establishing and managing such plantations. The necessary planting material was obtained by the United Fruit Company from its Panama plantation. At the end of World War II, there were five of these Government-owned abacá plantations located in four Central American countries, and their combined acreage totaled approximately 25,000 acres. These plantations were retained by the United States as a strategic resource after the end of the war. The United Fruit Companj'- continued to operate them for the United States.
(d) The Philippine abacá industry was never rehabilitated after the end of World War II. Prior to the war, it had produced about 400 million pounds of abacá fiber annually, but the Philippine production of the fiber did not amount to more than 160 million pounds in 1950, although there was then a greater demand for the fiber than there had been prior to World War II.
5. At the time when the Korean conflict began in 1950, abacá fiber was in short supply. Because of this shortage, there was enacted by the Congress of the United States a statute known as the Abacá Production Act of 1950 (64 Stat. 435). Section 3 of that act directed that “Production of abacá in the Western Hemisphere shall be continued by the United States Government,” but it was provided “That in no event shall the total number of acres under cultivation to abacá under this Act at any one time exceed fifty thousand.” The administrative authority under the act was vested in the President (section 4, at p. 436), but the President was expressly authorized to delegate his powers to any Department, agency, officer, Government corporation, or instrumentality of the United States.
S. Following the enactment of the Abacá Production Act of 1950, the President on or about August 21, 1950 delegated his administrative authority under that act to the RFC and directed that it take immediate action in order to increase the Government’s abacá acreage up to the authorized maximum of 50,000 acres. Within the RFC, the responsibility for developing a proposed program for the expansion of abacá acreage under the Abacá Production Act of 1950 was placed upon Stanley B. Hanes, Chief of the *76 Fiber Division, Office of Production, NFC. This responsibility included the tentative selection of the additional areas-to be developed as abacá plantations, the tentative selection of persons to establish and manage the new plantations, and the negotiation of proposed management contracts with such persons. Mr. I-Ianes did not have the power to make any final determination or commitment binding upon the RFC' or upon the United States with respect to the selection of areas for development, or the selection of plantation managers, or the making of management contracts. Instead, Mr. Hanes could only submit his proposals and recommendations respecting these matters through his immediate superior, the Manager of the Office of Production, to the Board of Directors of the RFC for consideration and final action on behalf of the United States. The limited scope of Mr. Hanes’ authority was known to Emery and its representatives during the negotiations that are related in subsequent findings.
7. (a) As a first step toward the development of a proposed program for the expansion of abacá acreage under the Abacá Production Act of 1950, Mr. Hanes endeavored to obtain from various sources, including o-ther agencies of the United States, information concerning areas in the Western Hemisphere that might provide suitable sites for the establishment of abacá plantations. Among the agencies solicited for information was the U. S. Department of Agriculture. As a result, Mr. Hanes received from that Department reports indicating that some abacá was being grown in Ecuador, and that Ecuador seemed to be a potentially valuable area for the production of abacá. Areas in Central America were also suggested to Mr. Hanes as possible sites for additional abacá plantations.
(b) The existing Ecuadorian abacá production as of 1950 mentioned in paragraph (a) of this finding was on three small plantations that had been established by members of the Yon Buchwald family. The Yon Buchwalds had obtained some planting material in 1930 from the experiment station of the U. S. Department of Agriculture in Panama, and had used the material to establish a small plantation south of Quevedo at San José, another small plantation east *77 of Quevedo at Ana Maria, and a third small plantation north of Quevedo at Camarones. As of 1950, the Von Buchwalds’ total acreage in abacá amounted to several hundred acres. This abacá was luxuriant in growth, strongly rooted, large in size and in the number of stalks per mat, and free of disease. From the standpoint of climate, moisture, soil, and terrain, the Camarones area was especially suitable for the growing of abacá.
8. In suggesting that Ecuador be considered in connection with the expansion of abacá acreage under the Abacá Production Act of 1950, the representatives of the U. S. Department of Agriculture expressed doubt as to whether the Von Buchwalds would be suitable to manage any Government-owned plantation or plantations that might be established in Ecuador. In this connection, it was learned by Mr. Hanes that Emery had been associated with the Von Buch-walds over a long period of time. Emery had helped finance the operations of the Von Buchwalds, had represented them in the marketing of the abacá fiber produced by them, and had purchased large quantities of balsa wood from a Von Buchwald-owned company. During World War II, Emmett B. Ford, Executive Vice President and general manager of Emery, had negotiated with the U. S. Board of Economic Warfare a contract for the sale to the United States of all the abacá fiber produced by the Von Buchwalds. The Board of Economic Warfare was represented during those contract negotiations by Paul R. Harmel, an employee of that agency.
9. Through a mutual acquaintance, Mr. Planes arranged for a conference with Mr. Ford in New York City on September 8, 1950. At the conference, Mr. Hanes explained that the RFC was considering the possible establishment of an abacá plantation in Ecuador, with a minimum of 5,000 acres; and he inquired whether Emery would be interested in operating the plantation for the United States. Mr. Hanes informed Mr. Ford that the RFC customarily reimbursed the operator of such an enterprise for the expenses incurred and, in addition, paid the operator a management fee. Mr. Ford replied that Emery was not an agricultural company and definitely was not interested in the proposal. Mr. Hanes asked Mr. Ford whether the latter could recommend *78 someone else as a possible operator, but Mr. Ford did not make any suggestion along that line.
10. (a) Late in December 1950, Mr. Harmel visited Mr. Hanes at the RFC. Mr. Harmel was no longer in the Government service, but was then engaged in the private practice of law in Washington, D. C. On the occasion of this visit, Mr. Harmel, who had been in contact with Mr. Ford during the interval since the Hanes-Ford conference on September 8, 1950, informed Mr. Hanes that Emery had been giving further consideration to the subject matter of the Hanes-Ford conference and might change its earlier lack of interest in undertaking the operation of an abacá plantation in Ecuador.
(b) On January 2, 1951, Mr. Harmel, who by that time had become a representative of Emery in connection with the abacá matter, informed Mr. Hanes that Emery had definitely decided to withdraw its previous disclaimer of interest in the proposed Ecuadorian development. It was understood by all concerned, both then' and thereafter, that the actual employment of Emery by the RFC for the establishment and operation of an abacá plantation in Ecuador would depend upon (1) the availability of a suitable area of land in Ecuador for an abacá plantation, (2) the negotiation by the RFC with Emery of a mutually satisfactory management contract, and (3) the negotiation by the RFC with the Government of Ecuador of an agreement concerning the establishment and operation by the United States of such a plantation in Ecuador.

The Availability of Land

11. In early January of 1951, it was decided by the RFC that an investigation would be made of Ecuador as a possible site for the establishment of an abacá plantation. Arrangements had already been made to have a group of soils experts from the U. S. Department of Agriculture conduct for the RFC investigations of different countries in Latin America that were deemed worthy of consideration in connection with the proposed expansion of abacá acreage under the Abacá Production Act of 1950. By means of a communication dated January 10, 1951, this group was requested by *79 the RFC to include Ecuador in the program of investigations. However, due to the intervention of the rainy season in Ecuador, and also to the fact that the agricultural experts were involved in the survey of potential plantation sites in Central America, it was not until May 1951 that they made a preliminary reconnaissance survey in Ecuador. On the basis of that survey, it was reported by the agricultural experts that the Quevedo region of Ecuador appeared to be favorable for the production of abacá, and it was recommended in particular that the Camarones area of that region be subjected to a comprehensive survey.
12. The recommendation that a comprehensive survey of the Camarones area be conducted was approved by the RFC in May 1951, and arrangements were made for such a survey to be conducted by experts from the U. S. Department of Agriculture. In this connection, the RFC requested Emery, and the latter agreed, to furnish assistance to the agricultural experts in the form of supplies, materials, engineering-services, and laborers. Under the agreement between the RFC and Emery with respect to this phase of the matter, Emery was to be reimbursed for its out-of-pocket expenses in rendering the assistance called for by the agreement, but was not to make any additional charge for its services.
13. As of the time in May 1951 when the RFC decided to conduct a comprehensive survey of the Camarones area, it was anticipated that the landholdings of the Yon Buchwald interests in that area were sufficiently large to provide the necessary acreage for an 8,000-acre abacá plantation (that being the size of plantation then under consideration). At the time, Mr. Hanes was under the impression that Emery held rights in these Yon Buchwald lands that assured their being available to the RFC if it should ultimately be decided to establish a Government-owned abacá plantation in the Camarones area under Emery’s management. However, as of May 1951 Emery did not have any rights in the Yon Buchwald lands, but had ascertained the willingness of the Yon Buchwald interests to cooperate in the contemplated abacá project, had obtained an oral commitment with respect to the granting of an option by the Von Buchwald interests for the purchase of the lands, and had engaged the services *80 of an attorney in Ecuador to study the Von Buchwald titles to the lands in question. In June 1951, Emery and the Von Buchwald interests entered into a formal agreement which, in effect, gave Emery an option until December 22, 1951 to purchase the Von Buchwald lands in the Camarones area, together with the abacá planting material at the San José and Ana Maria plantations, for $105,000. This option was later extended from time to time, and it was in effect during the events related in subsequent findings. Emery had no need for these lands, except in connection with the possible establishment of an abacá plantation for the NFC, and it intended to make the lands available to the NFC at cost in the event of the establishment of the plantation.
14. (a) The comprehensive survey of the Camarones area was begun in July 1951. The Camarones area is divided by the Quevedo Eiver into an eastern portion and a western portion. It was soon apparent that an efficient abacá plantation in that area should consist of contiguous lands; and, accordingly, attention was concentrated on the portion of the Camarones area lying west of the Quevedo Kiver. As the survey progressed, it was discovered that the Von Buchwald lands lying west of the Quevedo Niver were insufficient to provide the acreage for an 8,000-acre abacá plantation. This information was made known to Mr. Hanes, who thereupon requested Emery to obtain in its own name options on or rights in other contiguous lands within the area, so that a plantation of suitable size could be established in the event of a final determination to proceed with the establishment of a Government-owned abacá plantation in the Camarones area. Emery agreed to do so, and then proceeded to obtain options on or rights in other lands contiguous to the Von Buchwald holdings, with the result that Emery ultimately had the right to acquire a total of approximately 35,000 acres.
(b) The NFC has not compensated Emery for its services in connection with the acquisition of the options and rights referred to in paragraph (a) of this finding, or reimbursed Emery for its expenses incurred in carrying out this program. (Emery’s out-of-pocket expenses relative to this program are included in the figure set out in finding 41 (a).)
*81 (c) The evidence does not show how much time was devoted by personnel representing Emery to the program of acquiring options on or rights in lands, as outlined in paragraph (a) of this finding, or the amounts (if any) paid by Emery to such personnel as salary or otherwise (except to the extent that these amounts may be included in the out-of-pocket expenses referred tq in finding 41 (a)), or the value of such services to the RFC.
15. (a) The field activities in connection with the comprehensive survey of the Camarones area were completed in December 1951, but the final report and supplementary maps were not completed until January 1952. During the course of the survey, Emery was requested by the RFC in October of 1951 to take over the administrative details involved in conducting the survey. Emery agreed to do so, and sent an employee to Ecuador for such purpose. In November 1951, Mr. Ford went to Ecuador in order to help in expediting the survey.
(b) The RFC reimbursed Emery for the expenses which it incurred in rendering the various services requested by the RFC in connection with the survey, as outlined in paragraph (a) of this finding and in finding 12.[1] No compensation was paid to Emery for such services.
(c) The evidence does not show the value to the RFC of the services rendered by Emery in connection with the survey.
16. The final report by the agricultural experts on the Camarones area as a prospective site for an abacá plantation was highly favorable. The report indicated that in the portion of the Camarones area lying west of the Quevedo River there was available sufficient land suitable for the growing of abacá to permit the establishment and operation of an 8,000-acre plantation.

Contract Negotiations Between RFC and Emery

17. Prior to October 19, 1951, representatives of the RFC had not disclosed to Emery, and representatives of Emery *82 bad not disclosed to tbe EFC, any details regarding the provisions that would be considered essential or desirable for inclusion in a contract governing the management by Emery for the EFC of an abacá plantation in Ecuador. On October 19, 1951, a conference between representatives of the parties was held at the EFC for the purpose of affording Emery an opportunity to outline its views relative to provisions which such a contract ought to contain. Emery was represented at the conference by Messrs. Ford and Har-mel, and the EFC was represented by Mr. Hanes and others. The following proposals were made on behalf of Emery:
(1) During the period of the development of the plantation, beginning with the signing of the contract and extending for 3 years, the EFC would pay Emery a management fee calculated on the basis of $28 per acre per year on 8,000 acres.
(2) After the end of the development period, EFC would pay Emery a management fee calculated on the basis of 2 cents per pound for each pound of fiber produced or 20 percent of the gross operating profit (exclusive of interest, depreciation, and development expenses), whichever might be greater. A minimum management fee of $20 per acre per year would be guaranteed.
(3) Each party would have the discretionary right to cancel the contract on 90 days’ notice; and, in addition, the EFC would have the right to cancel for cause on 30 days’ notice.
(4) In the event that the United States should decide to dispose of the plantation, Emery would have an option to purchase it on the basis of the capital cost less reasonable depreciation.
(5) The other provisions of the contract between Emery and the EFC would be adopted from a contract which the EFC was then in the process of negotiating with the United Fruit Company relative to the management of additional proposed abacá plantations in Central America.
18. (a) On February 18, 1952, a conference was held between representatives of the EFC and of Emery for the purpose of endeavoring to reach a tentative agreement regarding a proposed management contract. Emery was repre *83 sented at this conference by Messrs. Ford and Harmel. The EFC was represented by Mr. Hanes, by Edwin A. Harris (who was then Mr. Hanes’ immediate superior), and by others. The following tentative proposals were suggested by the EFC representatives to Emery:
(1) The parties would sign a letter of intent, under which Emery would immediately undertake to recruit the necessary personnel and perfect an organization for the management of the proposed plantation. The letter of intent would extend for a maximum period of 90 days. During this period, Emery would not be paid any fee, but would be reimbursed for the salaries paid and the other expenses incurred by it under the letter of intent.
(2) Negotiations for a contract would be completed and the contract would be signed by the parties within the 90-day period previously mentioned.
(3) Under the contract, the planting of the plantation to abacá would be completed within 1 year after the signing of the contract. In this connection, the representatives of the EFC emphasized the necessity for the planting of the plantation to be completed within a maximum period of 15 months from the date of the signing of the letter of intent.
(4) The contract would provide for a development period (including the planting period previously mentioned) that would begin with the signing of the contract and continue until the production of abacá fiber on the plantation began, but there would be a proviso that the development period could not extend longer than 3 years from the date of the letter of intent. During the development period, Emery would be paid a management fee calculated on the basis of $24 per acre per year.
(5) The contract would provide that from and after the first production of abacá fiber on the plantation, Emery would be paid a management fee calculated on the basis of $18 per acre per year, plus 10 percent of the net operating-profit.
(6) Under the contract, the EFC would not reimburse Emery for any of its “stateside” expenses, but would pay a 3 percent fee on any procurement by Emery in the United States of equipment, etc., needed for the plantation.
*84 (7) Tbe contract would give the RFC a right of cancellation on 30 days’ notice, but Emery would not have a reciprocal right of cancellation.
(8) The contract would contain a realistic provision on depreciation, it being suggested that the period of depreciation be 10 years from the time when the plantation should come into bearing.
(9) The contract would provide that if the United States should decide to dispose of the plantation, Emery would have an option to purchase it at its “fair value,” to be determined at the time of sale.
(b) After the RFC proposals had been outlined at the conference on February 18, 1952, Mr. Ford stated that the suggestion of the RFC with respect to the post-development management fee was not acceptable to Emery. Mr. Ford said that, in lieu of the proposal made by the RFC on this point, the annual management fee per acre after the development period should be calculated as follows:
2 cents per pound on the first 1,000 pounds of fiber produced ;
1% cents per pound on the next 250 pounds of fiber produced; and
114 cents per pound on all production over 1,250 pounds.
The representatives of the RFC indicated that Mr. Ford’s counter-proposal on this point was unsatisfactory, and the conference adjourned on that note, without any tentative agreement having been reached on any of the provisions of a proposed contract.
19. On February 27, 1952, Mr. Harmel telephoned Mr. Harris and indicated that Emery had reconsidered the position taken by Mr. Ford at the conference on February 18, 1952 (see finding 18), and would be willing to accept a contract providing for a post-development management fee calculated on the basis of $18 per acre per year, plus 10 percent of the net operating profit, as proposed by the RFC. Mr. Harris passed this information on to Mr. Hanes, and suggested that the latter get in touch with Mr. Harmel as soon as possible with a view to working out a letter of intent and then concluding the contract negotiations with Emery.
20. Promptly after the events mentioned in finding 19, Mr. Hanes got in touch with Mr. Harmel and proposed that *85 a letter of intent between the RFC and Emery be prepared and signed. Mr. Harmel indicated that he regarded the signing of a letter of intent as unnecessary; and, instead, he proposed that the parties concentrate on the early completion of the negotiations relative to the drafting of a contract.
21. On March 5,1952, Mr. Harmel submitted to Mr. Hanes a draft of a proposed management contract that would extend until April 1, 1960, unless terminated sooner. Either party could cancel the contract prior to the termination date on 90 days’ notice. This draft included detailed provisions on the points that had been orally mentioned in broad outline at the conference on February 18, 1952, and also detailed provisions dealing with other subjects.
22. The draft of a proposed contract submitted by Mr. Harmel on March 5, 1952 was unsatisfactory to Mr. Hanes in a number of respects. Thereafter, there was prepared in the RFC under Mr. Hanes’ supervision another draft of a proposed contract that would extend until March 31,1960, unless sooner terminated. This draft, in effect, reserved to the United States the power to cancel the contract prior to the termination date at the Government’s discretion; and the draft gave to Emery the authority to cancel the contract if the United States defaulted in connection with any payment due Emery and persisted in such default after being notified by Emery of an intention to cancel the contract. The RFC draft, which was submitted by Mr. Hanes to Mr. Harmel on or about July 28, 1952, differed substantially from Mr. Harmel’s draft of March 5, 1952.
23. On or about August 15,1952, Mr. Harmel submitted to Mr. Hanes a memorandum containing a number of revisions desired by Emery in the draft of a proposed contract which Mr. Harmel had received from Mr. Hanes in July of 1952. After the submission of this memorandum, Mr. Harmel had meetings later in August with Messrs. Harris and Hanes concerning Emery’s suggested revisions in the RFC draft of a proposed contract. However, at the end of August there were still eight major points of difference on which agreement had not been reached by Messrs. Harris and Hanes, representing the RFC, and Mr. Harmel, representing Emery. :
*86 24. (a) Discussions between Messrs. Hanes and Harmel continued during September and October and into November 1962. As a result of these discussions, a couple of the points of difference that had been outstanding at the end of August 1952 were resolved, at least insofar as Mr. Hanes and Emery were concerned. However, the other points of difference were still outstanding between Mr. Hanes and Emery as of November 21,1952.
(b) With regard to the subject of the management fee, Mr. Hanes and Emery had agreed as of November 21, 1952 that the proposed contract should contain the following provisions:
(1) Beginning with the signing of the contract and extending for 3 months thereafter, the management fee would be payable at the rate of $3,500 per month.
(2) If it appeared at the end of the 3-month period that the title to the plantation lands was clear, the management fee would thereafter be payable for a period of 30 months at the rate of $16,000 per month.
(3) If, at the end of the 30-month period mentioned in (2) above, 8,000 acres or more of abacá lands were in cultivation, the management fee would be payable subsequently at the rate of $18 per acre per year, plus 10 percent of the net operating profit. However, no agreement had been reached between Mr. Hanes and Emery as to whether the minimum fee per acre should or should not be regarded as an operating expense in computing the amount, if any, of the net operating profit on which the 10 percent incentive payment would be due, or as to what the minimum fee per acre should be during this period if the acreage in cultivation were less than 8,000 acres.
(c) No further negotiations concerning the provisions of a proposed management contract took place between representatives of the RFC and representatives of Emery after November 21,1952.
25. By means of a communication dated November 21, 1952, the Director of the U. S. Bureau of the Budget informed the RFC that the President of the United States had approved a recommendation that no further expansion of abacá acreage be undertaken pending a review of the *87 program. On December 2, 1952, Mr. Hanes informed Mr. Harmel of the action of the President.
26. (a) Following a review of the abacá program, the President of the United States on April 10, 1953 instructed the EFC not to establish any new abacá plantations pursuant to the Abacá Production Act of 1950.
(b) Mr. Harmel was informed on April 13, 1953 of the decision against any further expansion of abacá acreage.

Negotiations Between RFC amd Ecuador

27. In the spring of 1952, Mr. Harris and another representative of the EFC went to Ecuador for the purpose of attempting to negotiate an agreement with representatives of the Ecuadorian Government relative to the establishment by the United States of an abacá plantation in Ecuador. The Government of Ecuador was represented in the negotiations by its Minister of Economy and Minister of Foreign Affairs. After a series of negotiations extending over a 3-week period, the negotiators drafted an agreement that was satisfactory to them. This draft of a proposed agreement was read and approved in principle by President Galo Plaza of Ecuador. However, the proposed agreement was subject to the approval of higher authority in the EFC, and it was necessary that it either be approved by the Congress of Ecuador or, if the matter were disposed of while the Ecuadorian Congress was not in session, that it be submitted to the National Economic Council for consideration and the making of a recommendation to the President of Ecuador.
23. On May 28,1952, the proposed agreement between the EFC and the Government of Ecuador was officially approved on behalf of the EFC. Subsequently, an official of the EFC was formally vested with the authority to sign the agreement on behalf of the EFC.
29. A national election having been held early in June of 1952 and Señor Yelasco Ibarra having been elected to be the President of Ecuador, the President-elect soon made it known that he would prefer that no further action be taken in connection with the proposed agreement between the EFC *88 and the Government of Ecuador, pending his review of the matter.
30. President Galo Plaza of Ecuador submitted the proposed agreement between the Ecuadorian Government and the RFC to the National Economic Council of Ecuador (the Ecuadorian Congress not being in session), but that agency on July 2, 1952 declined to pass upon the matter. The proposed agreement was thereafter resubmitted by President Galo Plaza to the National Economic Council, which on August 27, 1952 again declined to pass upon the agreement.
31. On December 8, 1952, the Ambassador of Ecuador to the United States called at the RFC for a conference concerning the proposed agreement between the Ecuadorian Government and the RFC. President Velasco Ibarra had taken office by that time. The Ambassador stated that he had received from his government an authorization to sign the proposed abacá agreement between the RFC and the Government of Ecuador, but that an amendment requiring preference in employment to be given to Ecuadorian agronomists was desired. Representatives of the RFC at the conference advised the Ambassador of their understanding that the signing of the agreement on behalf of the Government of Ecuador depended upon prior action by either the National Economic Council of Ecuador or the Congress of Ecuador. In addition, the representatives of the RFC informed the Ambassador that the RFC could not then sign the agreement because of instructions from the President of the United States to withhold any further abacá expansion pending a review of the abacá program.
32. The Congress of Ecuador convened on December 10, 1952. President Velasco Ibarra did not submit the proposed agreement between the Government of Ecuador and the RFC to the Ecuadorian Congress for consideration during its session.
33. In late December of 1952, the Government of Ecuador submitted to the RFC, through channels, a new draft of a proposed agreement between the Government of Ecuador and the RFC. This draft departed in certain important respects from the proposed agreement that had been tentatively agreed upon by the RFC and Ecuadorian negotiators *89 in tbe spring of 1952. The new draft was not acceptable to the RFC, and the objections of the RFC were made known to the Government of Ecuador through channels.
34. In early March of 1953, the RFC was informed by the Ambassador of Ecuador to the United States that the Government of Eucador was willing to acquiesce in the views expressed by the RFC concerning the Ecuadorian redraft of the proposed agreement between the RFC and the Government of Ecuador, and was willing to sign the agreement in the form desired by the RFC.
35. No agreement between the RFC and the Government of Ecuador with respect to the establishment by the United States of an abacá plantation in Ecuador was ever signed, due to the action of the President of the United States on April 10, 1953 in deciding that no new abacá plantations would be established pursuant to the Abacá Production Act of 1950.

Emery's Planning Activities

36. In view of the insistence by representatives of the RFC at the conference on February 18,1952 (see finding 18) that the planting of the abacá plantation in Ecuador (if it were established) would have to be completed within a period of 1 year after the signing of a contract between the RFC and Emery, and believing after about February 27, 1952 (see finding 19) that the parties would reach an agreement and sign a contract, Mr. Ford soon began, on his own initiative, intensive and extensive efforts to prepare as soon as possible plans for the establishment and operation of the prospective plantation. This program of planning involved locating and making tentative arrangements with competent persons for the staffing of the proposed enterprise, the assembling of pertinent data, and the making of detailed studies and engineering analyses dealing with anticipated problems and possible solutions in connection with: (1) the transportation of heavy equipment from a port of entry through primitive, jungle country to the plantation site; (2) the clearing of the l'ain forest and other jungle growth from the plantation site; (3) the grading of land and the laying out of roads and planting lines; (4) the digging and hauling of planting material from the existing abacá plan *90 tations to the site of the new plantation; (5) the planting of the plantation; (6) the harvesting of the abacá stalks and hauling them to the processing plant; (7) the processing, drying, and baling of the fiber; (8) the transportation of the fiber from the plantation to a port for shipment to the United States; and (9) the housing and welfare of plantation personnel.
37. The evidence indicates that Mr. Ford devoted a great deal of time over a period of months to the planning activities mentioned in finding 36, that such activities were conducted with great care and competence, and that he completed approximately three-fourths of the preliminary planning that would have been necessary for the establishment and operation of the proposed abacá plantation in Ecuador. The evidence does not show what percentage of Mr. Ford’s time was devoted to such planning activities, or the amount of the salary that Emery paid Mr. Ford during the period of these activities.
38. Mr. Ford’s planning activities were not conducted at the request of anyone representing the NFC, and the results of such activities were not furnished to the NFC.
39. The NFC did not compensate Emery for Mr. Ford’s planning activities or reimburse Emery for the expenses that were incurred in conducting such activities. (Emery’s out-of-pocket expenses in connection with this planning program are included in the figure that is set out in finding 41 (a).)
40. The evidence does not show the value that the NFC would have derived from Mr. Ford’s planning services if the NFC had received the benefit of them.

Emery's Out-of-Pocket Expenses

41. (a) The out-of-pocket expenses incurred by Emery in connection with the acquisition of options on or rights in lands within the Camarones area, in connection with the making of preliminary plans for the establishment and operation of the proposed abacá plantation, in connection with Mr. Ford’s trip to Ecuador, and in negotiating with the NFC, amounted to a total of $5,730.83. The NFC did not reimburse Emery for these expenses.
*91 (b) The sum of $3,315.76, at least, was expended by Emery in connection with the acquisition of options on or rights in lands. The evidence is not clear as to how much of this sum was expended in connection with the option on the Von Buchwald lands, which Emery obtained on its own initiative (see finding 13),[2] and how much was expended in obtaining options on or rights in other contiguous lands at the request of the EFC (see finding 14).
(c) The expenses incident to Mr. Ford’s trip to Ecuador amounted to $714.73. (See finding 15.)
(d) With respect to the remainder of the sum of $5,730.83 mentioned in paragraph (a) of this finding, after deducting the $3,315.76 mentioned in paragraph (b) and the $714.73 mentioned in paragraph (c), the evidence is not clear as to how such remainder should be allocated as between the land program, the planning program, and the conduct of negotiations.
RECOMMENDATION
It appears from the record that abacá is a plant that grows only in the tropics. The fiber of the plant has great tensile strength and good resistance to salt water. Its principal use is for marine cordage, but it is also extensively used where strong rope is needed. It is critical material and an adequate supply is vital to the military and industrial requirements of the United States.
Prior to World War II, the Philippines had been virtually the sole source of the abacá fiber used in the United States. The occupation of the islands during World War II cut off this supply. Efforts were made to develop it elsewhere, since the Philippine abacá industry was never rehabilitated after World War II. When the Korean conflict began in 1950, abacá fiber was in short supply.
In an effort to increase the supply the act of August 21, 1950, gave administrative authority to the Eeconstruction *92 Finance Corporation directing it to take immediate action to increase abacá production.
Following this enactment, tbe President delegated to the BFC responsibility for the development of a program of increasing production. The plaintiff company was contacted about development of a production area in Ecuador. The plaintiff company at first indicated that it was not interested, but later came back and said it would be willing to help develop the program which the RFC desired.
It was contemplated both by the plaintiff and the RFC that a contract would ultimately be made. In the meantime a survey was made of an 8,000-acre tract in Ecuador and the plaintiff company went to considerable expense in surveying and making arrangements for engaging in the production. The plaintiff company also made some surveys on its own, apparently in some matter entirely disconnected with the Government program. It is manifest that the expense in connection with the development of the Government’s portion of the program was incurred with the expectation that a contract would be later entered into. After considerable expense, many preliminary difficulties and outlay of substantial funds it was finally decided in February 1953, that the project would not be completed.
Since the plaintiff had incurred considerable expense and had used its forces in investigation and survey in securing options, as set out in detail in the findings, it claimed that in view of the final determination not to enter a contract the defendant should compensate the plaintiff for this outlay of expenses and for the work actually performed at the instance of the RFC or its officials.
A bill was introduced in the Senate for the relief of the plaintiff company which ultimately was referred to the United States Court of Claims for the purpose of determining whether or not there was any legal or equitable obligation on the United States to compensate the plaintiff for these expenses and for the work done.
As the trial commissioner has found (finding 15), the RFC expressly requested the Emery Company (referred to as “Emery”) to take over the administrative details of the comprehensive survey of the Camarones area of Ecuador. *93 Emery was also requested to acquire options and rights in the contiguous lands within the area. A great deal of time and effort was expended in connection with these operations. Mr. Ford spent a substantial amount of his time with this project and, in fact, went to Ecuador personally in 1951 to help in expediting the survey. None of these services was compensated for by the Government. The evidence does not show what percentage of Mr. Ford’s time was devoted to the planning activities nor the amount of salary that Emery paid Ford.
The failure of Emery to acquire the contract for the project was a financial hardship. It would be unjust to magnify the hardship by disallowing a claim for out-of-pocket expenses made, not as mere arrangements for an expected contract, but for expenses occasioned by its reliance on a contract which, barring extraordinary circumstances, would have been awarded to Emery.
Emery has given the court little concrete data as to the precise amount of the expenses it incurred for preparation for the Government’s project. But, as set out in finding 36, the planning involved considerable work as well as undoubted expense in a difficult and not easily accessible area. Unfortunately a detailed accounting is not shown. We have concluded that $20,000 represents a fair estimate of these expenses and the two years’ planning and work, as disclosed by such evidence and data as were submitted. This amount includes the $5,730.83 figure the trial commissioner found (finding 41) as representing certain out-of-pocket expenses. It also includes a reasonable allowance for that portion of the planning and other items set out in finding 36, as were actually done at the request of officials of the NFC.
We recommend the payment of $20,000 as the amount equitably due the plaintiff company as compensation in the circumstances disclosed by the record.
This opinion and the findings of fact will be certified to the Congress pursuant to S. Bes. 102, 84th Congress, 1st Session.
LaeamoRe, Judge; Maddew, Judge, and Whitaker, Judge, concur.

 Mr. Ford’s trip to Ecuador was not made at the request of the EEC, and the RFC did not reimburse Emery for the expense of that trip. Such expenses are included in the figures set out in paragraphs (a) and (c) of finding 41.

 Neither the sum of 55,730.83 mentioned in paragraph (a) nor the sum of $3,315.76 mentioned in paragraph (b) includes the sum of $1,000 (plus expenses) paid by Emery to an Ecuadorian attorney in November 1952 for a title opinion on the Von Buchwald lands, or the sum of $1,000 paid by Emery in December 1952 to obtain an extension of the option on the Von Buchwald lands. These expenses were authorized by the RFC, and it reimbursed Emery for them.